IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Senator Katie Muth, : 
         Petitioner : 
         : 
        v. :   No.  1346 C.D. 2022
         : 
Department of Environmental :   Argued: December 4, 2023
Protection and Eureka Resources, LLC : 
(Environmental Hearing Board), : 
        Respondents : 


BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE LORI A. DUMAS, Judge
                HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION
BY JUDGE McCULLOUGH               FILED: April 16, 2024

Senator Katie Muth[1] (Petitioner) petitions for review of the November 9, 2022 order issued by the Environmental Hearing Board (EHB) granting the Motion for Summary Judgment filed by Eureka Resources, LLC (Eureka) and dismissing Petitioner's appeal of the Department of Environmental Protection's (DEP) issuance of a wastewater treatment and discharge permit to Eureka, based on lack of individual standing.  Upon careful review, we affirm.

## I.    Factual and Procedural History

On March 24, 2021, Eureka submitted to the DEP a National Pollutant Discharge Elimination System (NPDES) Application for Individual Permit to Discharge Industrial Wastewater (Application).[2]  (Reproduced Record (R.R.) at 467a.)

---

[1] Petitioner is a Pennsylvania State Senator who lives in Royersford and represents District 44, which includes parts of Berks, Montgomery, and Chester Counties.

[2] The Application was made pursuant to Section 202 of The Clean Streams Law, Act of June 22, 1937, P.L. 1987, *as amended*, 35 P.S. §§ 691.1-691.1001 (Clean Streams Law or CSL), 35 P.S. § 691.202.

Pursuant to the Application, Eureka seeks to construct and operate an oil and gas wastewater treatment facility. The proposed site location is identified in the Application as 7305 State Route 29, Dimock Township, Susquehanna County, Pennsylvania. *Id.* at 489a. The project will involve six acres of earth disturbance, discharge of wastewater, operation of industrial waste treatment facilities, and air emissions, among other things. *Id.* at 493a-94a.

NPDES Permit PA0276405 (Permit) was issued to Eureka by the DEP on January 18, 2022. The Permit authorizes Eureka to discharge wastewater to Tributary 29418 to Burdick Creek, a tributary of the Susquehanna River, in Susquehanna County. On March 7, 2022, Petitioner filed a Notice of Appeal of the Permit to the EHB. *Id.* at 4a. An Amended Notice of Appeal was filed on March 28, 2022. *Id.* at 1811a. The primary basis for Petitioner's appeal was her allegation that the discharge of treated effluent from the facility will cause or exacerbate pollution of the Susquehanna River, its tributaries, and the Chesapeake Bay. Petitioner claimed standing to bring the appeal on behalf of all Pennsylvania residents based on her status as a Pennsylvania State Senator and as a "trustee" under article I, section 27 of the Pennsylvania Constitution, otherwise known as the Environmental Rights Amendment,[3] and on behalf of residents who live and work in Dimock Township and Susquehanna County[4] and who use and enjoy the land and waterways in the vicinity of the proposed facility, under a theory of

---

[3] The Environmental Rights Amendment states:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

PA. CONST. art. I, § 27.

[4] As the EHB points out, Petitioner's senatorial district does not include Dimock Township or Susquehanna County, nor is the proposed facility within her district.

2

"representational standing." She further alleged that she has individual standing in her own right to appeal the issuance of the Permit because she has spent time personally and professionally in Dimock Township where the proposed facility will be located, and that the issuance of the Permit will harm her because it will allow the discharge of "radioactive and other wastes into the waters of the Commonwealth, that will flow into the Chesapeake Bay Watershed, the Delaware River Basin, and the Susquehanna River Basin and surrounding areas in which she resides, works, and recreates." *Id.* at 4498a. On April 12, 2022, Eureka filed a Motion to Dismiss the Appeal, challenging Petitioner's standing to bring the appeal. *Id.* at 3462a.

On June 3, 2022, the EHB granted in part and denied in part Eureka's Motion to Dismiss. *Id.* at 4085a-99a. The EHB held that a state senator does not have representational standing to bring an appeal of an NPDES permit on behalf of residents who live and work in the vicinity of a proposed oil and gas waste treatment facility. The EHB further held that the Environmental Rights Amendment of the Pennsylvania Constitution does not grant special trustee standing to an individual legislator to appeal actions of the DEP in her role as an elected official.[5] As to the question of individual standing, the EHB deferred ruling on that issue until further discovery was conducted because a majority of the EHB was not able to reach a consensus on the question of Petitioner's individual standing. Summarizing Petitioner's allegations regarding her individual standing, the EHB explained:

> [Petitioner] states that **she has spent time personally and professionally in the [T]ownship of Dimock** where the proposed facility will be located . . . . She further alleges that the issuance of the [P]ermit will harm her because it will allow the discharge of "radioactive and other wastes into the

---

[5] Petitioner did not appeal the EHB's conclusions that she did not have representational or trustee standing to pursue her appeal of Eureka's Permit.

3

waters of the Commonwealth, that will flow **into the Chesapeake Bay Watershed, the Delaware River Basin, and the Susquehanna River Basin and surrounding areas in which [Petitioner] resides, works, and recreates." Discovery and additional motions directed to the issue of [Petitioner's] standing to pursue this appeal would assist the Board in resolving this issue**.

*Id.* at 4097a (emphasis added).

Thereafter, Eureka conducted discovery through interrogatories, requests for admissions, and a request for production of documents directed to Petitioner. In response to a request for production of documents seeking all documents which Petitioner believed supported her claim of individual standing to bring the appeal, Petitioner responded by producing "documents evidencing unreimbursed expenses during [her] trips to Dimock [Township]." *Id.* at 4264a. Those documents consisted of (1) four redacted credit card transaction reports showing that (a) on May 3, 2021, she spent one night at the Hampton Inn Tunkhannock Borough, Wyoming County; (b) on May 4, 2021, she made purchases at Sheetz Convenience Store in Trucksville, which is located in Kingston Township, Luzerne County; (c) on July 31, 2021, she made purchases at a Walmart and a Pilot gas station in Pittston, Luzerne County, and at the Sheetz Convenience Store in Trucksville; and (d) on January 23, 2022, she made credit card purchases at Checkered Express in Springville Township, Susquehanna County, a McDonald's in the City of Pittston, Luzerne County, and a Citgo in Montrose Borough, Susquehanna County; and (2) a redacted lease agreement that shows that she rented a shared apartment in the Harrisburg area after she was elected to the Pennsylvania State Senate. *Id.* at 4295a-97a.

In response to an interrogatory asking Petitioner to identify and state with particularity all facts that support her individual standing in this appeal, Petitioner's verified answer was as follows:

4

> [Petitioner] **has spent time, and currently spends time, personally and professionally in the Township of Dimock where the proposed facility would be located**. In addition, based on evidence from other Eureka facilities in the State, the discharge from the proposed facility would contain heavy metals, radioactive material and other materials, and will **discharge this material into the waters of the Commonwealth (*e.g.*[,] Burdick Creek) that is a tributary to the Susquehanna River. These are areas in which [Petitioner] resides, works, and recreates**. [Petitioner] has an apartment in Harrisburg, one of the many places where she works. The Susquehanna River runs through Harrisburg and is the source of drinking water for the City of Harrisburg. **[Petitioner] and her family enjoy recreating along the Susquehanna River, both in Harrisburg and Susquehanna County**. In addition, Burdick Creek is a drinking water source for livestock in the Dimock area, with dairy and beef cow farmers utilizing Burdick Creek for water supply. Eureka's discharge will be consumed by such animals, as well as fish, in the food chain consumed by [Petitioner] and others.

*Id.* at 4311a (emphasis added).

Upon completion of discovery, Eureka filed a Motion for Summary Judgment and related filings, arguing that Petitioner failed to come forth with evidence that she has individual standing to appeal the issuance of the Permit. *Id.* at 4165a. In support, Eureka summarized the evidence it had procured, and Petitioner had proffered during discovery, and argued:

- The credit card statements produced by Petitioner do not establish that she "recreates" anywhere near the proposed facility, or anywhere in Dimock Township, in Susquehanna County, or in the Susquehanna River or Chesapeake Bay watersheds. The credit card reports produced show that she was in Susquehanna County on one occasion on January 23, 2022. The other locations

5

on her credit card statements (Trucksville, Pittston, Tunkhannock) are in Luzerne and Wyoming Counties, not Susquehanna County.

- Official Senate reports show that Petitioner's visit to Susquehanna County and the Dimock area on May 3, 2021, was for official business in her capacity as State Senator.

- Petitioner's vague statement that she and her family enjoy "recreating" in the Susquehanna River watershed lacks any specificity because she did not state the type of activity, where and when it occurred, or when it may occur in the future.

- Having an apartment that Petitioner occupies occasionally in the City of Harrisburg, 147 miles from Dimock Township, cannot establish individual standing because Harrisburg is too distant from Dimock Township, Susquehanna County. Conferring individual standing on this theory would confer standing to appeal to every legislator and every other state employee who comes to Harrisburg occasionally for their official business to appeal to the EHB any DEP decisions covering the thousands of square miles of the Susquehanna watershed.

- Contrary to Petitioner's assertion that the Susquehanna River is "the source of drinking water for the City of Harrisburg," the City of Harrisburg has not used the Susquehanna River as a water source since 1996, other than several days in November each year to test the system.[6]

---

[6] Eureka produced the Affidavit of Charlotte Katzenmoyer, the CEO of Capital Region Water, which provides drinking water to the City of Harrisburg, who attested that the Susquehanna River is not the primary source of drinking water for the City of Harrisburg. According to Ms. Katzenmoyer, the primary source of drinking water for the City of Harrisburg is Clarks Creek in Dauphin County, the Susquehanna River is a secondary, emergency source of drinking water for the City, it is used
**(Footnote continued on next page…)**

- Petitioner resides and maintains a district office in Royersford, Montgomery County, which is in a different watershed than Dimock Township, and too far from Dimock (137 miles) to provide individual standing to Petitioner based on where she resides.

- Petitioner's alleged "food chain" exposure theory cannot establish individual standing because that supposed connection is so vague and attenuated, and unsupported by requested documentary evidence, as to be not sustainable as a basis for individual standing.

(R.R. at 4175a-81a.)

Petitioner filed a Response to the Summary Judgment Motion along with related filings, and Eureka filed a short Reply Brief. In her Answer to Eureka's Motion for Summary Judgment, Petitioner argued that she established her individual standing because she has credibly averred that "she visits the area of the proposed facility. She recreates there. She enjoys the environment, sightseeing, visiting good friends and acquaintances. She has recreated along Burdick Creek." *Id.* at 4341a.

---

only in situations of drought emergency or mechanical failure related to the Dehart Reservoir, the Susquehanna River has not been used as an emergency use since 1996; the Susquehanna River is used for several days a year, typically in November, as a source for the City as a means to ensure that the source is functioning properly, and during these periods, the water sources are blended, *i.e.*, 30% from the Susquehanna River and 70% from the Dehart Reservoir. (R.R. at 4316a.) Petitioner objected to the affidavit on the grounds that it was not provided to her prior to the Motion for Summary Judgment, she had no opportunity to depose or examine the affiant, and on the grounds that it violated the rule of *Borough of Nanty-Glo v. American Surety Co. of New York*, 163 A. 523 (Pa. 1932) (oral testimony, through affidavits or depositions, is insufficient to establish the absence of a genuine issue of material fact; no matter how clear and indisputable such proof may appear, it is the province of the jury to decide the credibility of the witnesses). *Id.* at 4356a. Therefore, she maintains that this remains an issue of disputed fact.

7

On November 9, 2022, the EHB concluded Petitioner lacked individual standing to appeal the Permit and granted Eureka's Motion for Summary Judgment[7] and dismissed her appeal. *Id.* at 4527a-40a. The EHB classified Petitioner's claims of how she asserted she would be impacted by the activities authorized by Eureka's Permit into three categories: (1) impacts to her recreational use of water resources in and around the Dimock area; (2) impacts to her use of water resources downstream of Dimock, specifically the Susquehanna River in and around Harrisburg; and (3) impacts to the food consumed by Petitioner and others. (EHB Opinion, 11/9/22, at 5.) The EHB explained why it was unconvinced that Petitioner had the requisite contact with the area to demonstrate that she had a direct interest in the outcome of the appeal:

> [N]one of [the] statements . . . concerning [Petitioner's] use of the potentially affected area in and around Dimock are supported by a citation to the record. A close examination of [Petitioner's] affidavit and verified responses to interrogatories and request for admissions and the documents produced in response to the request for production of documents do not contain support for the broad assertions regarding her use of the Dimock area . . . .
>
> ****
>
> The verified responses to the Interrogatories and the Request for Admissions . . . do not provide any information regarding [Petitioner's] use of the water resources in the Dimock area and, therefore, do not offer any support for her individual standing.
>
> ****
>
> [Petitioner] does not provide any explanation of the credit card charges or attempt to link them to her use of the water resources in or around the Dimock area.
>
> ****

---

[7] The EHB is empowered to grant summary judgment in appropriate cases. 25 Pa. Code § 1021.94a.

. . . [W]e are provided no details at all concerning the frequency, length, specific location and nature of the use she asserts in her answer. Given that her claim that she has individual standing was being aggressively challenged by Eureka, it was incumbent on her to bring forward all her evidence and provide sufficient detail about her activities to convince the [EHB] that she satisfied the standing requirements. We would have expected some discussion by way of answers to interrogatories or an affidavit detailing when, where, and how she spent time and recreated in Dimock and along the Susquehanna River in Susquehanna County. Further undermining her claim of individual standing, she failed to provide any physical evidence supporting her claim of use of the waters in the Dimock area beyond the three credit card statements and made no effort to explain how the credit card statements she provided in response to the request for production tie into her use claim. At best, and in the light most favorable to [Petitioner], the statements arguably demonstrate that she was in the broad vicinity of Dimock on three separate occasions in 2021. The lack of detail and supporting evidence as to her recreational use during those three occasions and any other times she may have been in Dimock strongly contrasts with the evidence of use presented in many of the cases where the [EHB] has found individual standing based on recreational use of a given area.

****

Ultimately our review of the verified information provided by [Petitioner] regarding her use of the affected area in and around Dimock fails to convince us that she has the requisite contact with the area to demonstrate that she has a substantial, direct and immediate interest in the outcome of the appeal.

*Id.* at 8-9.

Regarding Petitioner's use of the Susquehanna River in the Harrisburg area as a basis for claiming she has individual standing, the EHB explained why it again

9

found this claim too remote and speculative to constitute the type of direct and immediate harm required to find individual standing:

> [Petitioner] states that she and her family enjoy recreating along the Susquehanna River in Harrisburg. She also makes a reference to the Susquehanna serving as a source of drinking water for Harrisburg. . . . Once again, however, we have no details concerning [] what, when or how she and her family recreate along the Susquehanna River in the Harrisburg area nor any direct evidence of that fact. She also offers no support for her claim that the Susquehanna River is the source of drinking water for the City of Harrisburg. Eureka disputes that claim and states that the Susquehanna is not a primary source of drinking water and instead serves as a backup source. It claims that water from the Susquehanna only enters the drinking water system on limited occasions when the backup system is tested to ensure it remains operational. We need not resolve that dispute because even if we view that information in the light most favorable to [Petitioner] as we are required to do, we hold that the claim that the Susquehanna is a source of drinking water for the City of Harrisburg and that she may suffer some type of harm as a result of Eureka's discharge is not adequate to support her claim of individual standing. In order to have individual standing, there must be a causal connection between Eureka's discharge and the alleged harm claimed by [Petitioner] and that causal connection must be sufficiently close so as not to be remote or speculative. Given the readily apparent distances involved between the discharge point in Susquehanna County and any intake for the Harrisburg water system as well as the relative flows involved, the potential harm to [Petitioner] that may result from drinking treated water from the Susquehanna during the times she is in Harrisburg is too remote and speculative to constitute the type of direct and immediate harm required to find individual standing.

*Id.* at 10-11.

10

Lastly, regarding Petitioner's claim that Burdick Creek is a drinking water source for livestock in the Dimock area and that these livestock and fish are in the food chain consumed by her, the EHB found this claim also to be insufficient to satisfy the requirements that her interests in the outcome of the appeal are both direct and immediate to have individual standing because

> [Petitioner] offers no evidence in support of these alleged facts concerning the use of Burdick Creek by livestock or the likelihood of her consuming contaminated food raised in the Dimock area. The sequence of events required to lead to her consumption of such food strikes us as both remote and speculative and entirely within her control.

*Id.* at 11.

Petitioner now petitions for review.[8]

## II. Issues

We begin by noting that in her Statement of Questions Involved, Petitioner has listed nine issues.[9] However, in the argument section of her brief, she provides the

---

[8] The Commonwealth Court's standard of review of a final decision issued by the EHB is to determine whether the EHB's findings are supported by substantial evidence and whether the EHB made constitutional errors or errors of law. 2 Pa. C.S. § 704; *Brockway Borough Municipal Authority v. Department of Environmental Protection*, 131 A.3d 578, 585 n.9 (Pa. Cmwlth. 2016); *Groce v. Department of Environmental Protection*, 921 A.2d 567, 573 n.7 (Pa. Cmwlth. 2007). On issues of law, the Court's standard of review is *de novo* and its scope of review is plenary. *Department of Environmental Protection v. Cumberland Coal Resources, LP*, 102 A.3d 962, 970 (Pa. 2014).

[9] Those nine issues are:

> (1) [d]id the EHB err in granting summary judgment where material facts relating to [Petitioner's] standing are in dispute; (2) [d]id the EHB err in granting summary judgment in favor of Eureka [] where Eureka's Motion for Summary Judgment [] did not present a clear question of law; (3) [d]id the EHB err in failing to consider that [] Eureka – and not [Petitioner] – bears the burden of showing that there are no material facts in dispute with regard to [Petitioner's] standing and that Eureka failed to carry that burden; (4) [d]id the

**(Footnote continued on next page…)**

11

following two argument headings: (1) Individual Standing; and (2) Disputed Facts.[10] We shall limit our review to the issues for which Petitioner has offered developed argument. *Van Duser v. Unemployment Compensation Board of Review*, 642 A.2d 544 (Pa. Cmwlth. 1994).

Moreover, Petitioner raises two issues in Questions 6 and 7 that were not addressed by the EHB. Specifically, she argues that the Permit should not have been granted without prior EPA approval. The scope of this Court's review of a decision of the EHB is limited to issues raised in the proceedings before the EHB. 2 Pa. C.S. § 703; *Sunoco, Inc. v. Department of Environmental Protection*, 865 A.2d 960, 974 (Pa. Cmwlth. 2005). The only issue addressed by the EHB in its November 9, 2022 Opinion and Order was Petitioner's individual standing. Because the EHB concluded that Petitioner did not have individual standing to bring the appeal, the EHB did not address,

---

EHB err by failing to view the record in the light most favorable to [Petitioner] as the non-moving party; (5) [d]id the EHB err by granting the SJ Motion where the right to summary judgment is not clear and free from doubt; (6) [d]id the EHB err by granting the [Summary Judgment] Motion where the Environmental Protection Agency ("EPA") has stated to [Petitioner] that (a) the permit in question is not a type of permit that can be issued directly by the [DEP], (b) the EPA did not waive its review, and (c) the DEP never sent the NPDES Permit Application or other information to the EPA as it was obligated to do; (7) [d]id the EHB err by granting the [Summary Judgment] Motion where the DEP failed to obtain the approval from the EPA and such approval was required prior to the issuance of the permit; (8) [d]id the EHB err by failing to find that [Petitioner's] interest in the issuance of the permit is substantial, direct and immediate; and (9) [d]id the EHB err by failing to find that [Petitioner] has individual standing.

(Petitioner's Br. at 2-3.)

[10] A third heading in the argument section is entitled "Standard of Review of a Motion for Summary Judgment," and includes no argument aside from one sentence that reads: "Eureka has failed to show the absence of [a] dispute and has failed to carry its burden." (Petitioner's Br. at 12-13.) Because whether Eureka satisfied its burden on summary judgment is subsumed in the other two issues, we will not address this issue separately.

12

find facts about, or adjudicate any of the issues set forth in Petitioner's Notice of Appeal on their merits. Specifically, the EHB did not address Petitioner's allegations regarding the EPA's receipt, review, and approval of the NPDES Permit. Accordingly, Petitioner's Questions 6 and 7, which relate to the unaddressed substantive allegations in her notice of appeal, are outside this Court's appellate scope of review and will not be reviewed by the Court.

### III. Discussion

#### A. Individual Standing

In her first issue, Petitioner argues that she has demonstrated that she has the requisite direct interest in the issuance of the Permit by simply averring that she "uses the area in and around Dimock. She visits the area of the proposed [f]acility. She recreates there. She enjoys the environment, sightseeing, visiting good friends and acquaintances. She has recreated along Burdick Creek[,]" and that "[i]f the proposed [f]acility is built and put into operation, [she] and her family will have to avoid Burdick Creek, and everything produced by or which comes in contact with Burdick Creek, due to legitimate concerns about contamination." (Petitioner's Br. at 16-17.) Petitioner contends that these allegations, alone, are sufficient to establish her individual standing and that the EHB erred in concluding her connection to the discharge was too remote and unsubstantiated to establish standing to bring the underlying appeal. We must disagree.

An essential element of Petitioner's case is that she must have standing to bring her appeal. In other words, she must be aggrieved by the action under appeal, *i.e.*, the issuance of the Permit. Only persons and municipalities that have an interest which may be adversely affected by any action of the DEP under The Clean Streams Law have the right to file an appeal. Section 7(a) of The Clean Streams Law, 35 P.S.

13

§ 691.7(a) ("Any person or municipality having an interest which is or may be adversely affected by any action of [DEP] under this act shall have the right to appeal such action to the . . . [EHB].").[11]

The Pennsylvania Supreme Court has outlined the requirements for standing when a party challenges an administrative agency action as follows:

> [B]y virtue of Section 702 of the Administrative Agency Law, [2 Pa. C.S. § 702,] neither party status nor traditional aggrievement is necessary to challenge actions of an administrative agency. **Rather, standing to appeal administrative decisions extends to "persons," including non-parties, who have a "direct interest" in the subject matter, as distinguished from a "direct, immediate, and substantial" interest. A direct interest requires a showing that the matter complained of caused harm to the person's interest.** Although not the full equivalent of "direct, immediate, and substantial," the direct interest requirement retains the function of differentiating material interests that are discrete to some person or limited class of persons from more diffuse ones that are common among the citizenry.

*Citizens Against Gambling Subsidies, Inc. v. Pennsylvania Gaming Control Board*, 916 A.2d 624, 628 (Pa. 2007) (internal citations omitted) (emphasis added).

Because the elements of standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (*Defenders of Wildlife*). The appropriate evidentiary standard for reviewing a challenge to standing depends on when standing is challenged. At the pleading stage, general factual

---

[11] Section 7 of the Clean Streams Law was added by the Act of July 31, 1970, P.L. 653.

14

allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 889 (1990) (*National Wildlife Federation*). However, in response to a summary judgment motion, when challenged for lack of individual standing, the plaintiff can no longer rest on such mere allegations but must set forth by affidavit or other evidence specific facts, which for the purpose of summary judgment will be taken as true. *Defenders of Wildlife*, 504 U.S. at 561. *See also* Pa.R.Civ.P. 1035.2(2) (summary judgment is appropriate "if an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury"); *O'Rourke v. Pennsylvania Department of Corrections*, 730 A.2d 1039, 1041 (Pa. Cmwlth. 1999) (party opposing summary judgment must show "specific facts" in depositions, answers to interrogatories, admissions, or affidavits that there is a genuine issue for trial) (citing *Kee v. Pennsylvania Turnpike Commission*, 722 A.2d 1123 (Pa. Cmwlth. 1998)). Bold, unsupported assertions of conclusory accusations cannot create genuine issues of material fact. *See Brecher v. Cutler*, 578 A.2d 481 (Pa. Super. 1990).[12]

Here, as the EHB pointed out, Petitioner's claim that she has individual standing was aggressively challenged by Eureka in a summary judgment motion. Thus, it was incumbent on her, in opposition thereto, to come forward with specific facts to show that she uses the area affected by the Permit and has reasonable concerns that her

---

[12] While not binding, Superior Court decisions "offer persuasive precedent where they address analogous issues." *Lerch v. Unemployment Compensation Board of Review*, 180 A.3d 545, 550 (Pa. Cmwlth. 2018).

use and enjoyment of the area will be adversely affected by the proposed discharge activity.[13]

In cases involving appeals from DEP's issuance of a NPDES permit, our courts have found where, in opposition to a motion for summary judgment, the plaintiffs demonstrated injury **by facts and evidence** that they use the area affected by the permit and have reasonable concerns that their use and enjoyment of the area will be adversely affected by the proposed discharge activity.

For example, in *Food and Water Watch v. Department of Environmental Protection* (Pa. Cmwlth., Nos. 565 C.D. 2020, 621 C.D. 2020, 627 C.D. 2020, filed April 12, 2021),[14] this Court recently affirmed the EHB's determination that Food and Water Watch (FWW), a national nonprofit organization that advocates for clean water and public control of water resources, had standing to appeal the issuance of an NPDES permit to Keystone Protein Company (Keystone). The permit expressly authorized Keystone to discharge treated wastewater from its facility located in Bethel Township, Lebanon County, to Elizabeth Run, an unnamed tributary to Beach Run and Little Swatara Creek. *Id.*, slip op. at 2. FWW appealed the issuance of the permit to the EHB. The DEP and Keystone filed motions for summary judgment, challenging, *inter alia*, FWW's standing to appeal DEP's issuance of the Permit.[15] *Id.*, slip op. at 3. In

---

[13] Petitioner argues that if Eureka wanted to dispute her individual standing, it should have deposed her or served follow-up interrogatories to flesh out her answers. (Petitioner's Reply Br. at 5.) We disagree that this was Eureka's burden. "No burden is placed on the moving party to [present] such affidavits or depositions." *Harris by Harris v. Hanberry*, 613 A.2d 101, 104 (Pa. Cmwlth. 1992); *Salerno v. LaBarr*, 632 A.2d 1002, 1003 (Pa. Cmwlth. 1993).

[14] We cite this unpublished decision as persuasive authority pursuant to Section 414(a) of our Internal Operating Procedures. 210 Pa. Code § 69.414(a).

[15] An association like FWW has standing as the representative of its members, even in the absence of injury to itself, if it alleges that at least one of its members is suffering immediate or threatened injury because of the challenged action. *Robinson Township, Washington County v. Commonwealth*, 83 A.3d 901, 922 (Pa. 2013).

opposition to the motions for summary judgment, FWW offered the following testimony from two of its members, Debra Ryan and Ann Pinca:

> Ms. Ryan has lived near Swatara Creek most of her life and frequently visits the creek with her husband and children. When her children were young, she and her family used to "wade in the water, play with [their] dogs, and fish along the banks." Now that her children are grown, she enjoys hiking with them along the creek paths and picnicking with her grandchildren near the water. Ms. Ryan has also kayaked many times along various stretches of the creek. Ms. Ryan and her children have spent time kayaking, fishing, and walking their dogs along portions of the creek.

> Ms. Pinca lives a few miles from Swatara Creek and has a long history of advocating for its protection. She testified that her advocacy efforts are motivated in part by her personal use and enjoyment of Swatara Creek. Ms. Pinca and her husband purchased kayaks a few years ago to kayak on the creek and other local waterways. During the summers of 2016 and 2017, they kayaked three or four times, and in July 2018 they re-purchased permits that allowed them to kayak on the creek for two years. Ms. Pinca and her husband kayak in the area near the convergence of Swatara Creek and Little Swatara Creek. Ms. Pinca testified that while kayaking, she and her husband often have direct contact with the water. Ms. Pinca likes to wade in the water and look for animals and aquatic life while kayaking. Ms. Pinca is also a bird watcher. She has seen herons on the creek and eagles perched in trees adjacent to the stream. She once observed a bald eagle's nest along Little Swatara Creek, downstream from the Keystone discharge point. Ms. Pinca has also seen robins, blue jays, and squirrels in the area.

> Ms. Ryan and Ms. Pinca also expressed their concerns regarding the discharge authorized by the [p]ermit. Ms. Pinca is concerned that "increased pollution from [Keystone's] facility will degrade the ecosystem, deplete the water's oxygen levels, and harm fish and other wildlife." She

17

testified that the proposed discharge from Keystone's facility will diminish her enjoyment of kayaking and birdwatching near Little Swatara Creek and areas downstream. Similarly, Ms. Ryan is concerned that the proposed discharge will harm water quality in the areas where she enjoys kayaking and spending time with her family. She will not be able to hike near the creek with her sons' dogs for fear of them drinking polluted water. Ms. Ryan is particularly concerned that kayaking in polluted water could have negative health effects on her husband, who is immunosuppressed.

*Id.* at 8-9 (citations omitted).

We explained that, based on this specific and detailed testimony, FWW had established a direct interest in DEP's issuance of the permit so as to confer standing. *Id.* at 9.

United States (U.S.) Supreme Court precedent also provides instruction on the type of evidence that is sufficient to establish a plaintiff's environmental harm at the summary judgment stage. In *National Wildlife Federation*, the U.S. Supreme Court held that vague allegations of injury were insufficient for standing when unsupported by any specific showing that the plaintiff's use of land was affected by the challenged decision. There, the National Wildlife Federation (plaintiff) filed an action against the Bureau of Land Management (BLM) and other federal parties, alleging that BLM's land withdrawal renewal program, which opened mining in 4,500 acres of a 2-million-acre area, adversely affected its members' recreational use and enjoyment of the land. BLM moved for summary judgment pursuant to Federal Rule of Civil Procedure (F.R.Civ.P.) 56.[16] The U.S. Supreme Court held that the plaintiff had not

---

[16] F.R.Civ.P. 56(a), a provision which is similar to that set forth in Pa.R.Civ.P. 1035, provides:

(a) Motion for Summary Judgment or Partial Summary Judgment. A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary

**(Footnote continued on next page…)**

18

stated sufficient facts to warrant standing because, in its members' affidavits, the members merely claimed that they used lands in the vicinity of the affected area.

Explaining the standard in a federal summary judgment proceeding, the U.S. Supreme Court stated:

> Rule 56(e) provides that judgment "shall be entered" against the nonmoving party unless affidavits or other evidence "set forth specific facts showing that there is a genuine issue for trial." The object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit. . . . Rather, the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues.

*National Wildlife Federation*, 497 U.S. at 888-89.

Regarding how specific the facts must be, the High Court further explained,

> where the fact in question is the one put in issue by the [5 U.S.C.] § 702 challenge here—whether one of [the plaintiff's] members has been, or is threatened to be, "adversely affected or aggrieved" by Government action—Rule 56(e)[17] is assuredly not satisfied by averments which state only that one of [the plaintiff's] members **uses unspecified portions of an immense tract of territory, on**

judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

[17] F.R.Civ.P. 56(e) provides:

(e) Failing to Properly Support or Address a Fact. If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment.

**some portions of which mining activity has occurred or probably will occur by virtue of the governmental action**. **It will not do to "presume" the missing facts because without them the affidavits would not establish the injury that they generally allege. That converts the operation of Rule 56 to a circular promenade: plaintiff's complaint makes general allegation of injury; defendant contests through Rule 56 existence of specific facts to support injury; plaintiff responds with affidavit containing general allegation of injury, which must be deemed to constitute averment of requisite specific facts since otherwise allegation of injury would be unsupported (which is precisely what defendant claims it is).**

*Id.* (emphasis added).

The U.S. Supreme Court concluded that the plaintiffs did not put forward any specific facts to show they were or would be personally affected by the decision, because they only claimed to use "unspecified portions of an immense tract of territory," parts of which might be mined. *Id.* at 889. That is, the affidavits only stated a general allegation of injury, which was insufficient to survive a summary judgment motion. *Id.*

Here, Eureka contests through summary judgment the existence of specific facts to support an environmental injury, *i.e.*, Petitioner's standing to appeal the Permit. As in *National Wildlife Federation*, Petitioner only responded with general assertions that she uses unspecified portions of Dimock Township and the Susquehanna River. The Susquehanna River is 444 miles long, and its hundreds of tributaries, including Burdick Creek, drain 27,510 square miles. (R.R. at 4251a.) She has not alleged that she swims, sails, or fishes in those waters or comes into contact with the waters of Burdick Creek or the Susquehanna River. She does not explain how or when she uses the land around these waterways. Petitioner states generally that she recreates "in Dimock Township." However, she does not say **where,** in the entire Township of

20

Dimock, she recreates and whether whatever activity she engages in has any association to the discharge point. As the U.S. Supreme Court held in *National Wildlife Federation*, a plaintiff claiming injury from environmental damage must use the area affected by the challenged activity and not an area roughly "in the vicinity" of it. 497 U.S. at 887-89. We conclude that Petitioner, like the plaintiffs in *National Wildlife Federation*, has failed to produce evidence establishing a personal injury.

In *Defenders of Wildlife*, an environmental group, Defenders of Wildlife (DOW), brought an action challenging the U.S. Secretary of the Interior's (Secretary) refusal to extend the federal Endangered Species Act[18] protections to animals abroad. 504 U.S. at 562. The Secretary moved for summary judgment on the standing issue. In opposition, DOW relied on affidavits of two of its members, each stating that the member had traveled to a foreign country (one to Egypt, the other to Sri Lanka) on one occasion and observed the habitat of an endangered species, intended to do so again, and would suffer harm from the reduced chance of observing the species on that future visit due to the agency action. *Id.* at 563-64. The Supreme Court explained, that "to survive the Secretary's summary judgment motion, DOW had to submit affidavits or other evidence showing, **through specific facts**, not only that listed species were in fact being threatened by funded activities abroad, but also that one or more of respondents' members would thereby be "directly" affected apart from their "'special interest' in th[e] subject." *Id.* at 564 (emphasis added). Regarding the adequacy of the evidence submitted by DOW, the U.S. Supreme Court concluded that DOW had not made the requisite demonstration of injury. The U.S. Supreme Court went on to explain why the members' affidavits were insufficient:

_____

[18] 16 U.S.C. §§ 1531-1544.

21

[The Affidavits submitted in opposition to summary judgment] **plainly contain no facts**, **however, showing how damage to the species will produce "imminent" injury to Mses. Kelly and Skilbred**. That the women "had visited" the areas of the projects before the projects commenced proves nothing. As we have said in a related context, "'Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.'" [*City of Los Angeles v.*]*Lyons*, 461 U.S. 95[,] 102 [(1983)] (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-[]96, [] (1974)). And the affiants' profession of an "inten[t]" to return to the places they had visited before—where they will presumably, this time, be deprived of the opportunity to observe animals of the endangered species—is simply not enough. Such "some day" intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the "actual or imminent" injury that our cases require.

504 U.S. at 564 (emphasis added).

Instantly, the EHB reviewed Petitioner's Affidavit, her verified responses to Eureka's interrogatories, requests for production of documents, and requests for admissions and found that Petitioner failed to demonstrate that she has the requisite contact with the area to demonstrate that she has a direct interest in the outcome of the appeal – essentially because of the lack of detail in her allegations and her failure to come forward with any record evidence sufficient to demonstrate **how** she was aggrieved by the DEP's issuance of the Permit to Eureka. The EHB noted that Petitioner provided no information whatsoever regarding her **use** of the water resources in the Dimock area. It noted that Petitioner had alleged only that she visits friends in Dimock Township occasionally and that she "recreates" there. (R.R. at 4339a.) The EHB found it significant that she offered no discussion by way of answers to interrogatories or an affidavit detailing when, where, and how she spent time and

recreated in Dimock Township, in Burdick Creek, and the Susquehanna River. As the EHB also noted, the evidence Petitioner proffered in support of her claim she had been on personal trips to Susquehanna County demonstrated that she had only been in the **broad vicinity** of Dimock Township on three occasions in 2021, one of which was clearly business-related. As the EHB concluded, the credit card receipts produced by Petitioner, with no accompanying explanation whatsoever as to what they supposedly proved, were simply not enough to meet individual standing requirements. The lack of any linkage between the credit card receipts and her claimed injury seriously undermines her effort to establish standing.

In order to successfully defend against Eureka's request for summary judgment, Petitioner was required to submit sufficient evidence concerning her injury. She did not do so; instead, she merely reiterated what the EHB had earlier found to be lacking in specificity, namely that she "uses the area." The EHB had already explained that this was not enough to demonstrate that she had standing. *Compare Food & Water Watch* (where plaintiffs provided sufficient evidence that while kayaking, she and her husband often have direct contact with the water, and they like to wade in the water and look for animals and aquatic life while kayaking). Because we wholly agree that Petitioner's mere assertions that she "uses the area," that she "spends time" in the Township of Dimock, and that she "recreates" in Dimock Township and along the Susquehanna River are insufficient to establish the direct interest that our cases require, we are unable to conclude that the EHB erred by dismissing her appeal on the ground that she failed to create a genuine issue of material fact in support of Eureka's assertion that she lacks individual standing.

The EHB similarly denied individual standing on Petitioner's claim that she is impacted by the discharge in Dimock Township because she occasionally works

23

in Harrisburg (which is over 100 miles away), drinks the water there, and walks along the Susquehanna River. We are unable to conclude that the EHB erred in finding a lack of causal connection and the very remote likelihood of harm to Petitioner under this scenario. We agree with the EHB that her generic allegations are insufficient to establish individual standing.

With respect to Petitioner's food chain standing, the EHB held that the stated fear is that she may consume something that is impacted by what cattle or fish are exposed to in Dimock was far too remote to meet the "direct" standard for standing. Again, we must agree with the EHB that these allegations are too speculative to establish personal standing. Petitioner provided no evidence that any animals that produce food that she consumes drink from any of the waterways in question. She provided no evidence that she eats food that might be impacted from the Burdick Creek or its downstream waterways. The EHB was well within its reasonable discretion to determine that the supposed connection was simply too remote to constitute a direct interest.

Petitioner relies on *Friends of the Earth v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167 (2000), to argue that she has adequately established an injury in fact because she has averred that she (1) uses the affected area, and (2) Eureka's conduct has, or will, adversely affect that use. In other words, she believes that all she needs to do is simply **<u>aver</u> that she "uses" the affected area**. First, we do not agree that *Friends of the Earth* stands for such proposition. Further, despite Petitioner's assertion that *Friends of the Earth* is very similar to this case, the cases are quite different.

In *Friends of the Earth*, the U.S. Supreme Court discussed the type of evidence that is sufficient to establish a plaintiff's injury in fact at the summary

24

judgment stage. There, that Court held that Friends of the Earth (FOE) had provided adequate evidence of standing because their members had submitted affidavits and deposition testimony describing their "reasonable concerns" that the defendant's discharges of pollutants "directly affected those affiants' recreational, aesthetic, and economic interests." 528 U.S. at 183-84. Specifically, FOE member, Kenneth Lee Curtis, averred in affidavits that he lived a half-mile from Laidlaw's facility; that he occasionally drove over the North Tyger River, and that it looked and smelled polluted; and that he would like to fish, camp, swim, and picnic in and near the river between 3 and 15 miles downstream from the facility, as he did when he was a teenager, but would not do so because he was concerned that the water was polluted by Laidlaw's discharges. Curtis reaffirmed these statements in extensive deposition testimony. For example, he testified that he would like to fish in the river at a specific spot he used as a boy, but that he would not do so now because of his concerns about Laidlaw's discharges. Another FOE member, Angela Patterson, attested that she lived two miles from the facility; that before Laidlaw operated the facility, she picnicked, walked, birdwatched, and waded in and along the North Tyger River because of the natural beauty of the area; that she no longer engaged in these activities in or near the river because she was concerned about harmful effects from discharged pollutants; and that she and her husband would like to purchase a home near the river but did not intend to do so, in part because of Laidlaw's discharges.

Judy Pruitt averred that she lived one-quarter mile from Laidlaw's facility and would like to fish, hike, and picnic along the North Tyger River, but has refrained from those activities because of the discharges. FOE member Linda Moore attested that she lived 20 miles from Roebuck and would use the North Tyger River south of Roebuck and the land surrounding it for recreational purposes were she not concerned

25

that the water contained harmful pollutants. In her deposition, Linda Moore testified at length that she would hike, picnic, camp, swim, boat, and drive near or in the river were it not for her concerns about illegal discharges. Gail Lee attested that her home, which is near Laidlaw's facility, had a lower value than similar homes located farther from the facility, and that she believed the pollutant discharges accounted for some of the discrepancy. Sierra Club member Norman Sharp averred that he had canoed approximately 40 miles downstream of the Laidlaw facility and would like to canoe in the North Tyger River closer to Laidlaw's discharge point but did not do so because he was concerned that the water contained harmful pollutants.

With regard to these sworn statements, the U.S. Supreme Court held that the plaintiffs had adequately demonstrated injury with evidence that they lived near the facility and would have liked to fish, hike, wade, camp, or canoe near or in the river, but refrained from doing so for fear that the water contained harmful pollutants. The Court distinguished the case from *National Wildlife Federation*, noting that

> **[w]e have held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity**. . . . [T]he affidavits and testimony presented by [plaintiff] in this case assert that [defendant's] discharges, and the affiant members' reasonable concerns about the effects of those discharges, directly affected those affiants' recreational, aesthetic, and economic interests. These submissions present dispositively more than the mere general averments and conclusory allegations found inadequate in *National Wildlife Federation*.

528 U.S. at 183-84 (emphasis added) (citation omitted).

Contrary to Petitioner's overly narrow interpretation of the above excerpt, we do not agree that the U.S. Supreme Court intended to hold that it is sufficient for

26

environmental plaintiffs to merely **aver**, without more, that "they use the affected area." Rather, it is clear, that the U.S. Supreme Court was merely clarifying that environmental well-being is a cognizable interest for purposes of standing, while at the same time holding that to successfully aver that she uses the affected area, an environmental plaintiff must substantiate her averment with specific facts and a detailed description of the types of activities and how those would be affected by the challenged action. In other words, the formulation of injury has two components. First, plaintiffs must provide evidence that they "use the affected area," *id.* at 183, which is to say that they must establish "a cognizable interest for purpose of standing" in the environment that is allegedly being harmed. Second, plaintiffs must submit evidence that the value of their interest "'will be lessened' by the challenged activity." *Id.*

Here, Petitioner, in her various pleadings at the EHB level, and in her discovery responses, provided scant evidence and unsupported statements regarding how she would allegedly be impacted by the permitted discharge. In fact, she offered nothing more than a vague statement that she "recreates" in an area hundreds of miles from where she lives and works, and that she occasionally visits a friend whose property abuts the Burdick Creek. Petitioner does not articulate the activities she engages in (swimming, boating, fishing), when she recreates, or where she recreates (which river or stream). She does not, as she claims, reside anywhere near Dimock Township. Petitioner resides in Royersford. Royersford, Montgomery County is between 137 and 145 driving miles, depending on the route driven, from Dimock Township. (R.R. at 4187a.) Royersford, Montgomery County, is approximately 109 miles in direct distance, *i.e.*, "as the crow flies" from Dimock Township. *Id.* at 4188a. Moreover, Royersford, Montgomery County, is on the Schuylkill River and is in the Delaware River Basin, not the Susquehanna River Basin/Chesapeake Bay Watershed.

27

*Id.*  Neither Royersford nor any part of Montgomery County is in the Susquehanna River Basin or Chesapeake Bay Watershed.  *Id.*  Furthermore, Petitioner's apartment in Harrisburg is 147 miles from Dimock.

Regarding the May 3, 2021 and May 4, 2021 credit card receipts Petitioner produced, Petitioner did not provide any evidence that she incurred these expenses while in the area for recreational purposes as opposed to while there on business.  With regard to the July 31, 2021 and January 23, 2022 credit card receipts, Petitioner provided no explanation of the credit card charges or attempted to link them to her recreational use of the water resources in or around the Dimock area.  She did not allege that she was in, on, or around the Susquehanna River on those dates.

The EHB simply did not find Petitioner's evidence to be sufficient to establish standing to bring the underlying appeal because her alleged connection to the discharge was too remote and unsubstantiated.  We discern no abuse of discretion or error of law.  Petitioner has failed to create a genuine issue of material fact in support of her allegation that she has personally suffered any injury as the result of Eureka's alleged unlawful discharge of pollutants into Burdick Creek.  Accordingly, we must agree with the EHB that Petitioner failed to provide sufficient evidence that would allow a reasonable factfinder to conclude that she has standing to appeal the Permit.

**B. Disputed Facts**

Petitioner next claims that issues of fact remain because she and Eureka disagree as to the extent of her use of the area.  Specifically, she argues:

> Eureka claims that [Petitioner] does not have connections to Dimock and [Petitioner] states that she does. Eureka claims that [Petitioner] only visits Dimock in her professional capacity and [Petitioner] states that she and her family enjoy recreating in Dimock. Eureka claims that there is no evidence

28

> of individual standing and [Petitioner] points to the record
> which contains evidence and her statements.

(Petitioner's Br. at 20.)

This argument misses the mark. As we have just discussed, Petitioner failed to fulfill her obligation to come forward with credible evidence to support an objectively reasonable concern of harm to support her standing. At the summary judgment stage, when challenged for lack of standing, an appellant may not rest upon general allegations of interest. Rather, she must adduce "specific facts" to establish standing to pursue the relief he or she seeks. *See O'Rourke*.

In *Oatess v. Norris*, 637 A.2d 627 (Pa. Super. 1994), the Superior Court emphasized an appellant's duty to present verifiable evidence that unequivocally establishes a genuine issue for trial. If an appellant relies solely on "mere allegations" and "vague and general references," she has failed to meet her burden of proof. *Id.* at 629. To defeat summary judgment, the appellant must provide "specific facts that contradict the facts asserted" by the movant and thereby effectively substantiate each element of their claim. *Id.* at 630.

To the extent that Petitioner claims that there exist issues of fact regarding her connection to Dimock, it is only because she failed to provide facts when asked during discovery. If Petitioner possesses evidence to dispute facts set forth by Eureka, she had ample opportunity to produce it, but failed to. The EHB did not commit an error of law or a manifest abuse of discretion in determining that there were no outstanding material issues of fact in dispute.

The November 9, 2022 order of the EHB is affirmed.

_____
PATRICIA A. McCULLOUGH, Judge

Senior Judge Leadbetter dissents.

29

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Senator Katie Muth,            :
         Petitioner      :
                           :
         v.              :   No.   1346 C.D. 2022
                           :
Department of Environmental   :
Protection and Eureka Resources, LLC   :
(Environmental Hearing Board),   :
         Respondents   :

## *ORDER*

AND NOW, this 16th day of April, 2024, the November 9, 2022 order issued by the Environmental Hearing Board is hereby AFFIRMED.

_____
PATRICIA A. McCULLOUGH, Judge